IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 10, 2021 Session

## DEBORAH ELAINE MURDOCK v. JOEL MONTGOMERY MURDOCK

Appeal from the Chancery Court for Shelby County
No. CH-13-1230     JoeDae L. Jenkins, Chancellor

———————————————————

No. W2019-00979-COA-R3-CV

———————————————————

In this divorce case, Husband and Wife filed cross-appeals seeking review of the trial court's: (1) division of marital property; (2) award of alimony *in futuro* to Wife; and (3) award of alimony *in solido* to Wife. Husband raises additional issues concerning the trial court's reliance on testimony from Wife's medical expert and the trial court's refusal to apply the missing witness rule. Discerning no error, we affirm and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and CARMA DENNIS MCGEE, JJ., joined.

Darrell D. Blanton, Memphis, Tennessee, for the appellant, Joel Montgomery Murdock.

Robert F. Parsley, Jenna W. Fullerton, and Alexis Crutchfield, Knoxville, Tennessee, for the appellee, Deborah Elaine Murdock.


## OPINION

### I. Background

Appellant Joel Montgomery Murdock ("Husband") and Appellee Deborah Elaine Murdock ("Wife") married in 1994. The parties have two children, who were nearing adulthood when the parties separated; by the time of trial, the children were adults. Husband holds an undergraduate degree in engineering and two graduate degrees: one in engineering from Georgia Tech University, and one in engineering management from the University of Missouri. Both Husband and Wife worked for Boeing for a few years in Missouri before moving to Tennessee, where Husband took a job at FedEx. Husband

currently works as a Managing Director at FedEx. In 2017, Husband's annual base salary was $182,000. Husband typically received a yearly, lump-sum bonus of approximately $100,000. Throughout his employment, Husband also received various stock awards, including restricted stock and stock options.

Wife is an attorney. While attending law school (from 1995 to 1998), Wife worked as a software engineer and an intern in the Boeing legal department. When the parties moved to Tennessee, both Husband and Wife were offered jobs at FedEx. At that time, Wife was not admitted to practice law in Tennessee, and the position offered by FedEx was contingent on her passing the Tennessee Bar Exam. Wife was not able to pass the Tennessee Bar within the time allowed by FedEx; however, she did pass in July 2000. In November 2000, Wife accepted a position as a prosecuting attorney for Shelby County. Wife left that position six months later when she accepted employment as an attorney at Lexmark International in Lexington, Kentucky. She worked at Lexmark International from June 2001 until August 2002, when she moved back to Memphis. On her return to Tennessee, Wife was employed in various part-time legal positions until she eventually opened her own estate-planning law firm, the Murdock Firm, in 2006. It is undisputed that the Murdock Firm has not been profitable since it opened. From sometime in 2010 through June 2015, Wife was a part-time recruiter and trainer for the National Network of Estate Planning Attorneys, where she made $28,000 annually plus commissions. Wife was let go from that position in 2015. From 2003 through 2015, which period includes several years with zero income, Wife's annual income averaged $12,165. At trial, Wife stipulated that her earning capacity going forward is $1,000 per month.

On August 16, 2013, Wife filed a complaint for divorce, and Husband filed a counter-complaint on August 28, 2016. After protracted litigation, the divorce case was tried over six days in March 2018. At the time of trial, Wife was 60 years old, and Husband was 55. As discussed, *infra*, much of Wife's evidence at trial concerned the testimony of her expert psychologist, John V. Ciocca, Ph.D. Dr. Ciocca testified that a negative family dynamic arose in which Wife became the "odd person out." Wife is currently estranged from the parties' children and asserts that this alienation was the result of Husband's influence over the children. Dr. Ciocca opined that Wife's sense of loss and alienation, along with other factors, has undermined Wife's mental and emotional state. In 2016, Wife received in-patient diagnosis and treatment for 30 days at a mental health treatment center known as The Ranch. Wife has also obtained diagnoses and treatment for mental health problems from various other healthcare providers. Relying on diagnostic and treatment records from other providers and his own direct interviews with and observations of Wife, Dr. Ciocca testified that Wife suffers from co-existing mental disorders that impair her ability to work; these disorders include: (1) adult-type ADHD, for which Wife takes medication (diagnosed in 2009); (2) major depressive disorder (recurrent and severe); and (3) symptoms consistent with posttraumatic stress disorder. In Dr. Ciocca's opinion, Wife is unable to sustain the concentration necessary to work on a consistent basis as a lawyer or in any other capacity, and her long-term prognosis will depend on whether she is capable

of making significant improvement, which, at best, is uncertain. Dr. Ciocca opined that some of Wife's symptoms are consistent with having been in an abusive marriage. At trial, Husband offered no expert proof, but he opined that Wife will improve within three years and be able to return to the legal profession; as such, Husband contends that he should not have to pay alimony for longer than three years. In Husband's view, his paying alimony to Wife will merely encourage her to avoid working.

On September 6, 2018, the trial court entered findings of fact and conclusions of law, discussed *infra*. On October 5, 2018, the trial court entered a decree of divorce, which incorporated its previous findings. Husband moved to alter or amend the judgment, seeking clarification concerning the attorney's fee award and seeking certain other adjustments. Wife also moved to alter or amend the judgment, seeking clarification concerning the amount of alimony *in solido*. On December 7, 2018, the trial court entered separate orders on the parties' cross-motions to alter or amend. Thereafter, on May 22, 2019, the trial court entered two additional orders on the parties' motions to alter or amend the final decree of divorce, along with its Final Order. The trial court's specific findings are discussed *infra*. Husband filed his notice of appeal on June 3, 2019. On June 19, 2019, Wife also filed a notice of appeal.

## II. Issues

Husband raises the following issues as stated in his brief:

1. Whether the Trial Court erred by awarding Wife alimony *in futuro* in the amount of Five Thousand Five Hundred Dollars ($5,500) per month.
2. Whether the Trial Court erred by awarding Wife over Sixty Percent (60%) of the net marital estate.
3. Whether the Trial Court erred by allowing Dr. John Ciocca to testify as an expert when Dr. Ciocca did not administer the evaluation of the Wife and/or to allow Dr. Ciocca to modify an evaluation that he did not perform.
4. Whether the "Missing Witness" rule should be applied to the Wife for her failure to call her current treating psychologist, Dr. Jane Clement.
5. Whether the Trial Court erred by awarding Wife any of her attorney fees.

Wife raises the following additional issues as stated in her brief:

1. Whether the trial court abused its discretion by limiting the duration of alimony *in futuro* to 48 months, when Wife's earning capacity is $1,000 per month and she is disabled from working.
2. Whether the trial court should have awarded Wife a greater portion of her attorneys' fees, which Husband is able to pay.
3. Whether the trial court erred by ordering Wife to pay all expenses relating to the marital residence when her income and alimony *in futuro* award are

insufficient.

4. Whether the trial court should have awarded Wife a portion of Husband's additional stock options and bonuses received before the final divorce date.

5. Whether the trial court misconstrued the evidence by failing to find that Wife was subjected to parental alienation and abuse.

## III. Standard of Review

This case was tried without a jury. As such, "[o]ur review is de novo upon the record of the proceedings below with a presumption of correctness as to the trial court's factual findings unless the evidence preponderates against those findings." ***Barnes v. Barnes***, 193 S.W.3d 495, 498 (Tenn. 2006) (citing Tenn. R. App. P. 13(d)). However, the trial court's conclusions of law "are accorded no such presumption." ***Id***. (citing ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993)).

We also note that this Court is "required to defer to the trial court's credibility findings . . . ." ***Williams v. City of Burns***, 465 S.W.3d 96, 120 (Tenn. 2015); *see also* ***Street v. Street***, No. E2016-00531-COA-R3-CV, 2017 WL 1177034, at \*7 (Tenn. Ct. App. Mar. 29, 2017). In ***Wells v. Tennessee Board of Regents***, 9 S.W.3d 779 (Tenn. 1999), the Tennessee Supreme Court explained that

> trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See* ***State v. Pruett***, 788 S.W.2d 559, 561 (Tenn. 1990); ***Bowman v. Bowman***, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See* ***Tenn-Tex Properties v. Brownell-Electro, Inc.***, 778 S.W.2d 423, 425-26 (Tenn. 1989); ***Mitchell v. Archibald***, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See* ***Humphrey v. David Witherspoon, Inc.***, 734 S.W.2d 315, 315-16 (Tenn. 1987); ***Bingham v. Dyersburg Fabrics Co., Inc.***, 567 S.W.2d 169, 170 (Tenn. 1978).

***Wells***, 9 S.W.3d at 783. With the foregoing law in mind, we turn to the substantive issues raised.

## IV. Analysis

As set out in context above, the parties' respective issues broadly concern: (1) the evidence adduced at the hearing; (2) the division of marital property; and (3) alimony. We begin our analysis with a discussion of the disputed evidence.

- 4 -

## A. Evidence

## 1. Dr. Ciocca

In preparation for trial, Wife procured the services of Dr. John Ciocca to review her medical records and to render an opinion as to Wife's ability to work. Dr. Ciocca was admitted as an expert without objection by Husband. While not objecting to his qualifications as an expert, Husband did object to the testimony offered by Dr. Ciocca. Specifically, Husband asserted that Dr. Ciocca had not performed any evaluation on Wife and was not Wife's treating psychologist. As such, Husband argued that Dr. Ciocca's testimony was unreliable because he was merely parroting the expert opinions of other diagnosing and treating physicians and counselors, whose records Dr. Ciocca reviewed.

In support of his argument, Husband cites **Holder v. Westgate Resorts Ltd.**, wherein the Tennessee Supreme Court stated that, "Experts routinely consult other experts when forming their opinions. Rule 703, however, does not permit a testifying expert to act as the 'mouthpiece' of a non-testifying expert by simply parroting the non-testifying expert's opinion. The opinion to which an expert testifies must be his own." **Holder v. Westgate Resorts Ltd**, 356 S.W.3d 373, 380 (Tenn. 2011) (citations omitted). However, in **Allen v. Albea**, a case where, as here, the appellant relied on **Holder** for the proposition that the trial court erred in allowing one doctor to testify as the "mouthpiece" of another doctor, this Court noted that

> **Holder** did not involve physician testimony or medical reports received by a testifying physician during the course of treatment, and [] it was decided on a former version of Rule 703 of the Tennessee Rules of Evidence. **Holder**, 356 S.W.3d at 378. Rule 703 currently provides:
>
> > The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Generally, the opinion of an expert "must be based on facts in evidence." ***Evans v. Wilson***, 776 S.W.2d 939, 942 (Tenn. 1989). However, "a treating physician [is permitted] to give an expert opinion based on hearsay reports and tests received in aid of diagnosis and treatment of a patient. It is an exception to the traditional view excluding expert opinions based on the hearsay reports of others." ***Id***. (citing See, D. Paine, Tennessee Law of Evidence § 176 (1974)). The ***Evans*** court observed, "the reliability and trustworthiness of the hearsay [medical] reports and tests [are] established by their use by the treating physician in treatment and diagnosis." ***Id***.

***Allen v. Albea***, 476 S.W. 3d 366, 379-80 (Tenn. Ct. App. 2015), *perm. app. denied* (Tenn. Sept. 16, 2015).

The following medical records were admitted, without objection, as collective trial exhibit 1: (1) records from Wife's stay at The Ranch; (2) Dr. Valerie Augustus' Psychiatric Diagnostic Evaluation; (3) medical records from Wife's treatment by Dr. Ara Hanissian; (4) medical records from Germantown Psychological Associates, PC; and (5) Dr. Heather Hardison's Psychological Evaluation. Based on the current law in Tennessee, as succinctly set out in ***Allen***, the fact that Dr. Ciocca did not perform additional tests and was not Wife's treating physician does not negate or preclude his testimony based on the medical records he reviewed. Here, the parties stipulated that Dr. Ciocca, a licensed psychologist, was qualified to testify as an expert. Specifically, Husband's attorney stated, on the record, that, "[Dr. Ciocca] is an expert psychologist. I'll stipulate he's an expert psychologist." Like any qualified medical expert, Dr. Ciocca was permitted to rely on properly authenticated diagnostic and treatment records from Wife's other healthcare providers, regardless of whether those records themselves were admissible into evidence— and here they were both admissible and admitted without objection from Husband. Tenn. R. Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."); ***Evans***, 776 S.W.2d at 942 ("[T]he reliability and trustworthiness of the hearsay reports and tests were established by their use by the treating physician in treatment and diagnosis. Once reliability and trustworthiness are established in this manner, however, there is no reason why a forensic physician should not be permitted to rely on the same reports and tests in giving his or her expert medical opinion."); ***Brown v. Crown Equip. Corp.***, 181 S.W.3d 268, 278 (Tenn. 2005) ("An expert may rely upon both data collected by others and tests performed by others in reaching his or her conclusions.").

Turning to the record, although Dr. Ciocca generally agreed with Dr. Hardison's assessment that Wife's ability to work was limited, Dr. Ciocca did not merely "parrot" Dr. Hardison's findings. Rather, as Dr. Ciocca testified, he conducted an independent review of Wife's medical records, asked for clarification on certain information therein, and

requested additional testing, to-wit:

Q [to Dr. Ciocca]. Okay. Now, since your retention in this cause, what is your role?

A. My role [] was to update [Wife's] evaluation as needed and review the evaluations and medical records that had been produced to that date, and so I reviewed her medical records, her evaluations and I interviewed her to assess her current level, her current status.

Q. All right.

A. And I also referred her to Semmes-Murphey Neurology because I realized after assessing her, interviewing her, reviewing the full assessment done by her psychologist, Dr. Hardison, that there were some questions that arose that needed to be answered about the possible underlying neurological basis for some of her symptoms and Dr. [Debashis] Biswas answered those questions for us.

Q. Thank you. And so did you perform all of these tasks that you just recited for the Court?

A. Yes.

Q. All right. Now, when you performed—are these the types of functions that you might typically perform as an expert in a case?

A. Yes. It depends on the type of case.

Q. And do you normally review the work of the professionals?

A. Yes. There are opportunities. When conducting an evaluation, you know, in the—that is involved in litigation, that will be involved in litigation, it's always important to review the outstanding records.

Q. And is the manner that you have prepared for in this case one that demonstrates reliable principles and methods of psychology?

A. Yes.

***

Q. Okay. Have you taken the facts . . . the mental health records that you reviewed in this cause and used them in forming your opinions that you are prepared to give today?

A. Yes.

Q. And with regard to the underlying professionals whose records you have reviewed if a question arose about something in one of those records did you take action?

A. Yes, I did. I contacted—if I had questions about some element of the records, I contacted the person who produced the records.

Q. Were all—did that happen in this case?

A. It did.

Q. All right. And were your questions sufficiently answered to your satisfaction?

A. That's correct.
Q. Do you believe that you have been provided with sufficient information regarding this case to render an opinion on her mental health?
A. Yes.

Additionally, Dr. Ciocca testified that he conducted at least nine in-person evaluations of Wife. During these appointments, Dr. Ciocca testified that Wife reported her symptoms and other facts directly to him, and he relied on Wife's statements in forming his opinion. "Medical professionals reasonably may be expected to rely on self-reported patient histories. Such histories provide information upon which physicians may, and at times must, rely in their diagnostic work." *State v. Scott*, 275 S.W.3d 395, 408 (Tenn. 2009) (citing *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000)).

From Dr. Ciocca's undisputed testimony, it is clear that in forming his opinions concerning Wife's mental health and ability to work, Dr. Ciocca reasonably and appropriately relied on diagnostic and treatment records from Wife's various providers along with other information he gleaned from his own evaluation and from his referral of Wife to Dr. Biswas at Semmes-Murphey. In fact, throughout his testimony, Dr. Ciocca explained:

- "I reviewed her medical records, her evaluations and I interviewed her to assess her current level, her current state."
- "[I]f I had questions about some element of the [Wife's medical] records, I contacted the person who produced the records."
- "I referred her to Dr. Biswas . . . ."
- Explaining that his opinions were "in my view" and "based on my assessment."

Finally, contrary to Husband's argument, Dr. Ciocca did not merely "parrot" Dr. Harbison's opinion. In fact, Dr. Ciocca disagreed with Dr. Hardison concerning Wife's PTSD diagnosis, to-wit:

Q. Let's talk about the diagnosis of PTSD, which correct me if I'm wrong, I believe came from The Ranch and from Dr. Hardison.
A. That's correct.
Q. Do you agree or disagree?
A. Well, I agree that she has symptoms associated with the traumatic stress response; that she does have symptoms that are associated with suffering from trauma. My disagreement with Dr. Hardison in my assessment of Ms. Murdock is that I didn't believe that she was still suffering from a full syndrome and could be diagnosed with full syndrome posttraumatic stress disorder, which, you know, has a lot of moving parts to it, and I don't believe that she had all those symptoms that were required . . . .

However, when Dr. Ciocca agreed with the diagnoses of other healthcare providers, he clearly did so based on his own independent evaluation. If Husband was not satisfied with Dr. Ciocca's testimony, then cross-examination or countervailing expert proof were Husband's options for attacking it, not exclusion of the testimony. The trial court did not commit error in allowing, or relying on, Dr. Ciocca's expert testimony.

## 2. Missing Witness Rule

Husband contends that the trial court should have applied the missing witness rule to Dr. Jane Clement, Wife's most recent counselor. The Tennessee Supreme Court recently explained:

> Tennessee's law of evidence recognizes the common law rule that a party "may comment upon the failure . . . to call an available and material witness whose testimony would ordinarily be expected to favor" the opposing party. *State v. Francis*, 669 S.W.2d 85, 88 (Tenn. 1984). The missing witness rule may apply when the evidence shows that a witness who was not called to testify knew about material facts, had a relationship with the party "that would naturally incline the witness to favor the party," and the witness was available to the process of the court. *Id*. (quoting *Delk v. State*, 590 S.W.2d 435, 440 (Tenn. 1979)) . . . .
>
> The logic of this common law principle stems from the commonsense inference that "[a] party's intentional efforts to keep evidence from the fact-finder" is reasonably "interpreted as an implied admission of weakness in that party's case." Robert H. Stier, Jr., *Revisiting the Missing Witness Inference—Quieting the Loud Voice from the Empty Chair*, 44 Md. L. Rev. 137, 140 (1985). This "inference, which Wigmore calls 'one of the simplest in human experience,'" *id*. (quoting 2 John Wigmore, *Evidence in Trials at Common Law* § 278, at 133 (J. Chadbourne rev. ed. 1979)), is well-grounded in Tennessee law. Yet we have applied it with due caution for the "several dangers inherent" in its operation, such as adding false weight or significance to testimony that a court has not heard. *See Francis*, 669 S.W.2d at 89. Thus, we strictly construe the missing witness rule and its elements. *Id*.

*In re Mattie L.*, 618 S.W.3d 335, 342-43 (Tenn. 2021) (extending the missing witness rule to non-jury cases).

Based on his contention that Dr. Clement's testimony would have favored Wife, Husband argues that Wife's failure to call Dr. Clement at trial should have resulted in the trial court drawing a negative inference—*i.e.*, that Dr. Clement's testimony, if introduced, would have been unfavorable to Wife concerning her mental health and ability to work. As stated in Husband's brief:

In this case, the treating psychologist with the most current diagnosis and prognosis was Dr. Jane Clement. Dr. Clement was available as a witness for Wife but Wife failed to call her to testify. Further her records were not provided as exhibits. Therefore, the presumption must be that Wife's failure to call Dr. Clement would be Wife's intentional effort to keep evidence from the fact finder: to wit Wife's ability to work. Of all the treating psychologists, Dr. Smith, Dr. Luscomb and the therapists at The Ranch, none of them were of the opinion Wife could not work. Therefore, it should be presumed that had Dr. Clement testified, she, too, would have testified to Wife's ability to work.

First, Husband has not established that Dr. Clement's testimony would include any opinion as to Wife's vocational ability. Furthermore, although Dr. Clement would necessarily have knowledge of Wife's mental health as her treating psychologist, Husband has not shown that Dr. Clement's testimony necessarily would have favored Wife. ***In re Mattie L.***, 618 S.W.3d at 342.

In arguing for the missing witness rule, the parties' respective attorneys engaged in the following discussion at the hearing:

[Wife's Attorney]: Your Honor, may I respond to the request to take the missing witness rule? . . . Had [Husband's attorney] indicated that he wanted to have her testify, we certainly would have made her available to testify. He filed a motion about trying to get her records, and we indicated that we didn't intend to have her testify, but that he could certainly issue a subpoena to get her records. So I'd ask the Court not to take into consideration that her testimony would have been detrimental. It was also a cost factor. Your Honor. You know, we had a witness. Dr. Ciocca, to be able to testify as to her mental health. The decision was made because of the cost of that as well, and I'd just ask the Court not to take that her testimony would have been in any way detrimental to Ms. Murdock.

[Husband's Attorney]: Your Honor, [Wife's Attorney] is accurate in that I filed a motion for Dr. Clement's records, and I said then . . . the burden is on Ms. Murdock to prove her inability to work. At that motion hearing I was informed and the Court ruled that if Dr. Clement's records—because I said I only want these records if they are going to be used by Dr. Ciocca to support his opinion because you would think, he's giving the opinion, he's the evaluator, he would get the most current records, but I was told and you were told, he hadn't spoken to her; he's not going to use her records. That's what I wanted. I cannot subpoena Dr. Clement. I cannot make her come to court. I cannot force her to come to court. She will not testify for me. She is exempt

from subpoena. I can't bring her. And one of the requirements for the missing witness rule is the witness has to be under the solitary purview of one of the litigants, not the other, and since the only person who could get Dr. Clement here is Ms. Murdock, the missing witness rule applies.

Respectfully, Husband's attorney's statements are inaccurate under the facts of this case. Tennessee Code Annotated section 24-1-207 provides, in relevant part:

> (a) Communications between a patient and a licensed physician when practicing as a psychiatrist in the course of and in connection with a therapeutic counseling relationship regardless of whether the therapy is individual, joint, or group, are privileged in proceedings before judicial and quasi-judicial tribunals. Neither the psychiatrist nor any member of the staff may testify or be compelled to testify as to such communications or otherwise reveal them in such proceedings without consent of the patient **except:**
> 
> **(1) In proceedings in which the patient raises the issue of the patient's mental or emotional condition** . . . .

Tenn. Code Ann. § 24-1-207 (a)(1) (emphasis added).  Here, there can be no dispute that Wife's "mental [and] emotional condition" are at the heart of Wife's allegation that she is entitled to spousal support because these conditions preclude gainful employment. Accordingly, Husband could have relied on the foregoing statute to compel Dr. Clement's testimony even in the absence of Wife's consent.  Having failed to avail himself of the statutory exception, Husband cannot be heard to complain on appeal.  Tenn. R. App. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

## B. Division of marital property

The Tennessee Supreme Court has articulated the appellate standard of review for a trial court's division of a marital estate as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." ***Herrera v. Herrera***, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn. R. App. P. 13(d); ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn.

- 11 -

1993). . . . The trial court's conclusions of law, however, are accorded no presumption of correctness. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741, 744-45 (Tenn. 2002).

***Keyt v. Keyt***, 244 S.W.3d 321, 327 (Tenn. 2007). In the more recent case of ***Larsen-Ball v. Ball***, 301 S.W.3d 228 (Tenn. 2010), the Tennessee Supreme Court reasserted the deferential standard of review articulated in ***Keyt***, to-wit:

> After classifying the divorcing parties' assets as either separate or marital, the trial court must divide the marital estate equitably by weighing the relevant factors enumerated in Tennessee Code Annotated section 36-4-121(c). We give great weight to the trial court's division of marital property and "'are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.'" [***Keyt***, 244 S.W.3d at 327] (quoting [***Herrera***, 944 S.W.2d at 389]).

Tennessee Code Annotated section 36-4-121(c) provides that in making an equitable division of marital property, the trial court shall consider all relevant factors, including, but not limited to:

> (1) The duration of the marriage;
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> (4) The relative ability of each party for future acquisitions of capital assets and income;
> (5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

> \*\*\*

> (6) The value of the separate property of each party;

> \*\*\*

> (8) The economic circumstances of each party at the time the division of property is to become effective;

- 12 -

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

\*\*\*

(11) The amount of social security benefits available to each spouse. . . .

Tenn. Code Ann. § 36-4-121(c).

Because trial courts have broad discretion in dividing the marital estate, the division of marital property is not a mechanical process. As this Court has explained:

> The approach to dividing a marital estate should not be mechanical, but rather should entail carefully weighing the relevant factors in Tenn. Code Ann. § 36-4-121(c) in light of the evidence that the parties have presented. *Flannary v. Flannary*, 121 S.W.3d [647,] 650-51 [(Tenn. 2003)]; *Tate v. Tate*, 138 S.W.3d 872, 875 (Tenn. Ct. App. 2003); *Kinard v. Kinard*, 986 S.W.2d [220], 230 [(Tenn. Ct. App. 1998)]. Trial courts have broad discretion in fashioning an equitable division of marital property, *Jolly v. Jolly*, 130 S.W.3d 783, 785 (Tenn. 2004); *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn. 1983), and appellate courts must accord great weight to a trial court's division of marital property. *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996); *Batson v. Batson*, 769 S.W.2d 849, 859 [(Tenn. Ct. App. 1988)]. Accordingly, it is not our role to tweak the manner in which a trial court has divided the marital property. *Morton v. Morton*, 182 S.W.3d [821], 834 [(Tenn. Ct. App. 2005)]. Rather, our role is to determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in Tenn. Code Ann. § 36-4-121(c) is consistent with logic and reason, and whether the trial court's division of the marital property is equitable. [*Jolly*,] 130 S.W.3d at 785-86; *Gratton v. Gratton*, No. M2004-01964-COA-R3-CV, 2006 WL 794883, at *7 (Tenn. Ct. App. Mar. 28, 2006) (No Tenn. R. App. P. 11 application filed); [*Kinard*,] 986 S.W.2d at 231.

*Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007).

The trial court awarded "Wife 60% of the overall marital estate" and awarded "Husband 40%" of the marital estate. Specifically, Wife received: (1) 80% of the net proceeds from the sale of the marital residence (anticipated to be $75,296); (2) checking account in the amount of $2,382; (3) checking account in the amount of $1,380; (4) $3,196 in funds held in Wife's attorney's escrow account; (5) Murdock Law Firm and all personalty owned by the firm; (6) one-half of FedEx stock options granted on 6/9/15 and

6/6/16; (7) 2005 Ford Expedition; (8) Wells Fargo IRA; (9) $100,575 (approximately 62%) of Husband's FedEx Portable Pension; (10) 50% of Husband's FedEx Traditional pension benefits; and (11) Wife's Boeing pension. Wife was charged with marital debt in the total amount of $98,576. Husband received the following marital property: (1) 20% of the net proceeds from the sale of the marital residence plus funds spent to prepare the house for sale; (2) savings account in the amount of $45,004; (3) savings account in the amount of $513; (4) checking account in the amount of $5,733; (5) two additional savings account in the amount of $126; (6) one-half of FedEx stock options granted on 6/9/15 and 6/6/16; (7) restricted FedEx stock in the amount $25,063; (8) 2011 Ford Taurus; (9) two Ford Fusion vehicles driven by the parties' children; (10) Husband's Boeing pension; (11) Wells Fargo IRA; (12) $100,575 (approximately 62%) of Husband's FedEx Portable Pension; (13) 50% of Husband's FedEx Traditional pension benefits; and (14) 100% of Husband's FedEx Vanguard Retirement Savings Plan. Husband was charged with marital debt in the total amount of $47,323.

In dividing the marital estate and debts, the trial court made the following findings based on its consideration of the foregoing statutory factors:

4. Tenn. Code Ann. § 36-4-121(c)(1): *The duration of the marriage*: This is a long-term marriage of twenty-three (23) years.

5. Tenn. Code Ann. § 36-4-121(c)(2): *The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties*: Husband is 55 and Wife is 60 years of age. Husband is in good physical health, and Wife is impaired by mental health problems including Attention Deficit/Hyperactivity Disorder; Major Depression, recurrent and ongoing (and severe); and symptoms of Post-traumatic stress disorder. Due to her mental health problems, Wife is presently not able to practice law full-time. Wife is imputed an income of $1,000 per month. In 2016, Husband earned $276,035 as managing director with FedEx, including his bonuses and stock options. In 2017, Husband earned $276,401, including his bonuses and stock options. Husband has unsecured debt in the amount of $37,336. Wife has unsecured debt in the amount of $98,576. In his Rule 14 affidavit, Husband projects monthly expenses in the amount of $13,340, excluding $6,000 in monthly legal fees. In her Rule 14 affidavit, Wife's monthly expenses are anticipated to be $7,051 after this divorce.

6. Tenn. Code Ann. § 36-4-121(c)(3): *The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party:* Until the children became teenagers, Wife was their primary caretaker. When Husband was offered a management position at FedEx, Wife gave her up job with Lexmark and her and the children returned to Memphis. Husband's career with FedEx has thereafter flourished.

7. Tenn. Code Ann. § 36-4-121(c)(4): *The relative ability of each party for*

- 14 -

*future acquisitions of capital assets and income*: Husband has the ability to acquire significant future assets and income at a high rate. Whereas Wife has a diminished ability to earn any income due to her current mental status.

8. Tenn. Code Ann. § 36-4-121 (c)(5)(A): *The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role; and (B) For purposes of subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed*: Until 2006, when Wife opened her own law firm, Wife was the primary caretaker for the children. Husband frequently travelled for business and Wife took care of the home and children. Wife opened her own law firm in 2006, and it has not been a successful business. The income, bonuses and stock options acquired by Husband were used to pay for family expenses, including the college related expenses of the parties' children. Wife's objection to the payment of college expenses is inconsistent with her premium on the children's education. Wife's objection was made known during the pendency of the divorce proceeding after the obligations to fund college expenses were incurred by Husband. Under these circumstances, Husband has not used the funds for a purpose that is contrary to the marriage and the expenditures are not wasteful. The Court concludes there is no dissipation of marital assets on the part of Husband.

9. Tenn. Code Ann. § 36-4-121(c)(6): *The value of the separate property of each party*: Husband has a savings account with $45,000. Wife has an expectancy interest of approximately $20,000 when her deceased Mother's home sells. The parties stipulated that each would receive their respective Boeing pension.

***

11. Tenn. Code Ann. § 36-4-121(c)(8): *The economic circumstances of each party at the time the division of property is to become effective*: Husband has demonstrated earnings of approximately $276,000/year in 2016 and 2017, whereas Wife only has the present ability to earn $12,000/year. Wife will have more unsecured debt to service than Husband.

12. Tenn. Code Ann. § 36-4-121(c)(9): *The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset*: The parties have equally divided their tax liability for 2017 and it has been paid in full. There are no other tax consequences that weigh in favor of either party under this factor.

- 15 -

14. Tenn. Code Ann. § 36-4-121(c)(11): *The amount of social security benefits available to each spouse*: Wife's social security draw at age 70 is $2,710/month. At full retirement age (66 years, 8 months), it is $2,137/month. At age 62, it is $1,523/month. Husband did not present proof as to his social security benefit amount.

In his appellate brief, Husband summarizes his position on the trial court's division of marital property as follows: "Based upon the facts and the size of this marital estate, Husband alleges the division as ordered by the Trial Court is not equitable. Husband alleges the division of the net marital estate should be equal." It is well established that '[a]n equitable division of marital property is not necessarily an equal division, and § 36-4-121(a)(1) only requires an equitable division." *McHugh v. McHugh*, No. E2009-01391-COA-R3-CV, 2010 WL 1526140, at *3 (Tenn. Ct. App. Apr. 16, 2010) (citations omitted). Nonetheless, in his brief, Husband makes the following argument in support of his contention that the trial court's division of the marital estate was inequitable:

[T]he Trial Court ordered Husband to pay $65,000 toward Wife's attorney fees. According to Wife's Affidavit of Assets and Liabilities (which proposed the 60/40 division) Wife received net assets of $279,414 and Husband received net assets of $186,199. However, when you then reduce Husband's award by $65,000 in Wife's attorney fees, Husband's net drops to $121,199 ($186,199 - $65,000 = $121,199) and his net percentage of division drops to 30%. (Wife's net = $279,414 + Husband's net = $121,199 equals net marital estate of $400,613. $121,199 is 30% of $400,613).

(citations to record omitted). Ostensibly, Husband argues that the trial court first should have made its award of alimony *in solido* and then should have divided the marital estate equitably, taking into consideration its award of alimony *in solido*. The statutory scheme, however, does not support Husband's argument. In the first instance, the statutory factors set out in Tennessee Code Annotated section 36-4-121(c) for the division of marital property do not include a factor concerning the award of alimony. However, Tennessee Code Annotated section 36-5-121(i), which contains the factors to be considered in an award of alimony, does direct the court to consider "[t]he provisions made with regard to the marital property." Tenn. Code Ann. § 36-5-121(i)(8). It is well settled that "statutes should not be interpreted in isolation. The overall statutory framework must be considered, and '[s]tatutes that relate to the same subject matter or have a common purpose must be read *in pari materia* so as to give the intended effect to both.'" *Coffee Cnty. Bd. of Educ. v. City of Tullahoma*, 574 S.W.3d 832, 846 (Tenn. 2019) (quoting *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015)). Applying the doctrine of *in pari materia* to sections 36-5-121(i) and 36-4-121(c), it is clear that the legislature did not intend the award of spousal support to be a consideration in the equitable division of the marital estate; however, it did

intend the division of marital property to be considered in awarding alimony.  Because the division of marital property is a consideration in the award of spousal support, the trial court was correct to first divide the marital estate before considering the award of alimony.

Aside from statutory interpretation, this Court previously rejected an argument similar to that made by Husband in this case.  In ***Stratienko v. Stratienko***, 529 S.W.3d 389 (Tenn. Ct. App. 2017), as in the instant case, husband argued that "an award of alimony *in solido* is typically utilized to equalize a marital property distribution and is therefore inappropriate in [] case[s], where the property distribution was already equal." ***Id.*** at 406. Although a trial court may award alimony *in solido* to adjust the distribution of marital property, ***Burlew v. Burlew***, 40 S.W.3d 465, 471 (Tenn. 2001), this is not the sole purpose of such an award.  Tennessee Code Annotated section 36-5-121(d) states that alimony *in solido* "may be awarded in lieu of or in addition to any other alimony award, **in order to provide support**, including attorney fees, where appropriate." Tenn. Code Ann. § 36-5-121(d)(5) (emphasis added).   Tennessee Code Annotated section 36-5-121(h) further provides that, "[t]he purpose of this form of alimony [i.e., alimony *in solido*] is to provide financial support to a spouse." Tenn. Code Ann. § 36-5-121(h)(1)). As we explained in ***Stratienko***,

> [b]ecause the statute makes no mention of utilizing alimony *in solido* solely to equalize a property distribution, alimony *in solido* is recognized as a form of long-term support that may be used to adjust a marital property distribution or to provide financial support to a spouse.

***Stratienko***, 529 S.W.3d at 406.  In ***Stratienko***, the trial court made an equal distribution of marital property before awarding Wife alimony *in futuro* in the amount of $5,000 per month plus alimony *in solido* in the amount of $4,500 per month for ten years   *Id*. at 407. In affirming the trial court's award, this Court noted that, "[t]he alimony *in solido* award was not made to equalize the marital property distribution because such purpose had already been accomplished. Rather, the trial court reasoned that such award was necessary to prevent Husband from voluntarily reducing his income in order to thwart Wife's ability to collect spousal support." ***Id.***; *see also* ***Burlew***, 40 S.W.3d at 472 (affirming the trial court's award of alimony *in solido* of $220,000 to wife even though she was awarded 60.7% of the marital estate); ***Langley v. Langley***, No. M2002-02278-COA-R3-CV, 2003 WL 22989026, at *3 (Tenn. Ct. App. Dec. 19, 2003) (holding that an award of alimony *in solido* in the amount of $360,000 would be affirmed despite the trial court's award of 57% of the marital estate, or 1.3 million dollars, to the wife); ***Coke v. Coke***, No. 02A01-9210-CV-00279, 1993 WL 477016, at *4 (Tenn. Ct. App. Nov. 15, 1993) (holding that an award of alimony *in solido* was appropriate, despite the near-equal division of marital property, because an award of periodic alimony would result in the wife "constantly hav[ing] to battle Husband for those payments.").

Turning to Wife's argument concerning the division of marital property, she contends that the trial court erred in granting Husband's motion to quash an October 2018 subpoena from Wife seeking to ascertain the amount of Husband's bonuses and stock options received in 2018. Wife asserts that Husband's 2018 stock options and bonuses are marital property, which the trial court should have divided in making an equitable distribution of the marital estate. Wife further contends that the 2018 bonuses and stock options should have been considered in the trial court's calculation of Husband's income for purposes of division of the marital estate.

Concerning Wife's allegation that Husband's 2018 bonuses and stock options were marital property subject to equitable division, we disagree. Tennessee Code Annotated section 36-4-121 defines "marital property," in relevant part as

> all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage **up to the date of the final divorce hearing** and owned by either or both spouses as of the date of filing of a complaint for divorce. . . and including any property to which a right was acquired **up to the date of the final divorce hearing, and valued as of a date as near as reasonably possible to the final divorce hearing date** . . . .

Tenn. Code Ann. § 36-4-121(b)(1)(A) (emphases added). Here, the final divorce hearing occurred on March 19, 20, 21, 22, and 27 of 2018. As such, any bonuses or stock options Husband received from FedEx after March 2018 were not part of the marital estate under the foregoing definition. Accordingly, the trial court did not abuse its discretion is granting Husband's motion to quash, and in omitting Husband's 2018 bonuses and stock options from the marital estate.

Wife next argues that the trial court erred in its division of the marital estate by charging her with the mortgage and insurance payments on the marital residence. Specifically, she states that, "[e]ven if the Court uses the income considered by the trial court (approximately $276,000 for the years 2016 and 2017), Husband would still be able to pay both the alimony award and housing expenses." In its December 7, 2018 order on Husband's motion to alter or amend the final decree of divorce, the trial court ordered that "[b]eginning January 1, 2019, Wife shall be responsible for the payment of the monthly mortgage note on the marital residence and the homeowner's insurance. The parties shall equally divide and pay the property taxes." The trial court's ruling was based, *inter alia*, on the fact that Wife elected to move into the marital residence. On appeal, Wife specifically argues that, "[i]ncluding expenses for the marital residence and $6,500 in alimony, Husband is left with a surplus of $3,488 [per month]." Accordingly, Wife maintains that "the trial court erred by requiring Wife to pay the marital-residence expenses without increasing alimony." Allowing *arguendo* that Husband's income would allow him the ability to pay both the alimony award and the expenses of the marital residence,

such fact does not, *ipso facto*, suggest that an order requiring him to do so would be equitable in this case. From the record, the parties agreed that the marital residence would be sold, and Wife's decision to move back into the residence was made, in part, to facilitate the sale of the property. In dividing the marital property, the trial court awarded Wife "80% of the net proceeds from the sale of the marital residence (anticipated to be $75,296)" and charged her with the mortgage debt and insurance payments on this asset. The Tennessee Supreme Court has outlined four factors to be considered in making an equitable division of marital debt: (1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt. *Alford v. Alford*, 120 S.W.3d 810, 813 (citing *Mondelli v. Howard*, 780 S.W.2d 769 (Tenn. Ct. App. 1989)). Here, factors one and three support the trial court's decision to charge Wife with the marital residence expenses. Had the trial court ordered Husband to pay the expenses of the marital residence until such time as the residence sold, Husband would be contributing additional equity into an asset, the majority of which would ultimately inure to Wife's benefit (as she would receive 80% of the sales price). Furthermore, requiring Husband to pay the expenses of the marital residence could give Wife reason to delay the sale of same so as to accrue additional equity in the asset from Husband's additional mortgage payments. This would not be equitable. In view of the *Alford* factors and in consideration of the competing equities, we conclude that the trial court did not abuse its discretion in charging Wife with the payment of the mortgage and insurance on the marital residence. In its order on Wife's motion to alter or amend, the trial court granted Wife autonomy in selling the marital residence. Specifically, the trial court held that she "shall choose a listing agent and be responsible for the sale of the home." Wife need only achieve her goal of selling the property to relieve herself of the mortgage and insurance obligation.

## C. Alimony

Trial courts have "broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011); *Burlew*, 40 S.W.3d at 470; *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000). Absent an abuse of discretion, the appellate court is generally disinclined to second-guess the trial judge's decision on spousal support. *Gonsewski*, 350 S.W.3d at 105 (citing *Kinard*, 986 S.W.2d at 234). Abuse of discretion is found only when the trial court applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that caused an injustice to the complaining party. *Discover Bank v. Morgan*, 363 S.W.3d 479, 487 (Tenn. 2012) (citing *State v. Jordan*, 325 S.W.3d 1, 39 (Tenn. 2010)). Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made," or "as long as it falls within a range of acceptable alternatives." The standard does not permit the appellate court to substitute its judgment for that of the trial court. *Discover Bank*, 363 S.W.3d at 487; *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001); *Salvucci v. Salvucci*, No. W2013-01967-COA-R3-CV, 2014 WL 4201441, at *7 (Tenn. Ct. App. Aug. 26, 2014).

Tennessee recognizes four types of alimony: rehabilitative alimony, transitional alimony, alimony *in futuro*, and alimony *in solido*. In determining whether to award alimony, the court must first consider whether the spouse seeking alimony is economically disadvantaged. ***Perry v. Perry***, 114 S.W.3d 465, 467 (Tenn. 2003). "Once the trial court has found a party to be economically disadvantaged relative to his or her spouse, it must determine the nature, amount, length of term, and manner of payment of the award." ***Id***. In setting the type, duration, and amount of support, courts are guided by the following list of statutory factors:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
(3) The duration of the marriage;
(4) The age and mental condition of each party;
(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

***

(7) The separate assets of each party, both real and personal, tangible and intangible;
(8) The provisions made with regard to the marital property, as defined in § 36-4-121;
(9) The standard of living of the parties established during the marriage;
(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i). In addition to the factors found in Tennessee Code Annotated section 36-5-121(i), the two most relevant factors in determining the amount of alimony awarded are the economically disadvantaged spouse's need and the obligor spouse's ability to pay. ***Robertson v. Robertson***, 76 S.W.3d 337, 342 (Tenn. 2002). When considering these two factors, the primary consideration is the disadvantaged spouse's need. ***Watters v. Watters***, 22 S.W.3d 817, 821 (Tenn. Ct. App. 1999). "There are no hard

and fast rules for spousal support decisions, and such determinations require a 'careful balancing' of the relevant factors." ***Miller v. Miller***, No. M2002-02731-COA-R3-CV, 2003 WL 22938950, at \*3 (Tenn. Ct. App. Dec. 10, 2003) (citing ***Anderton v. Anderton***, 988 S.W.2d 675, 682-83 (Tenn. Ct. App. 1998)).

In awarding alimony *in futuro* and alimony *in solido*, the trial court considered many of the foregoing statutory factors and found, in relevant part:

> 20. Tenn. Code Ann. § 36-5-121(i)(1): *The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources*: Husband has a higher current earning capacity. Due to mental illness, Wife's current earning capacity is diminished. Wife is imputed an income of $1,000 per month, in 2016 and 2017, Husband earned approximately $276,000 from his income from FedEx, including his bonuses and stock options. According to his Rule 14 affidavit, Husband has monthly expenses in the amount of $19,340, including $6,000/month for legal fees. According to her Rule 14 affidavit, Wife's monthly expenses are anticipated to be $7,051 after the divorce. Wife can draw social security of $1,523 at age 62, $2,137 at age 66, 8 months and $2,710 at age 70. At age 65, Wife will begin receiving $872/month from her Boeing pension. Husband has a Boeing pension that will pay $692 at age 65. Wife can begin drawing from her portion of Husband's FedEx retirement accounts at the earliest age that Husband can draw from them, and Wife is 4.5 years older than Husband.
>
> 21. Tenn. Code Ann. § 36-5-121(i)(2): *The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level*: Both parties have a bachelor's degree in engineering. Husband has a Master's degree in electrical engineering and a second Master's degree in engineering management. Wife received a juris doctorate, practiced as a patent attorney and trained as Rule 31 mediator.
>
> 22. Tenn. Code Ann. § 36-5-121(i)(3): *The duration of the marriage*: The parties have been married for twenty-three years; thus, this is a marriage of long duration.
>
> 23. Tenn. Code Ann. § 36-5-121(i)(4): *The age and mental condition of each party*: Husband is fifty-five (55) years old, and Wife is sixty (60) years old. Wife suffers from Attention Deficit/Hyperactivity Disorder, Major Depression, and has symptoms of Post-traumatic stress disorder.
>
> 24. Tenn. Code Ann. § 36-5-121(i)(5): *The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease*: Husband is in good health, and Wife has problems with her gait and her back.

26. Tenn. Code Ann. § 36-5-121(i)(7): *The separate assets of each party, both real and personal, tangible and intangible*: Husband has a savings account with $45,000. Wife has an expectancy interest of approximately $20,000 when her deceased Mother's home sells. The parties stipulated that each would receive their respective Boeing pension.

27. Tenn. Code Ann. § 36-5-121 (i)(8): *The provisions made with regard to the marital property*, as defined in § 36-4-121. Wife will receive a larger share of the marital assets; however, Wife will be responsible for a larger share of the debts as occasioned by expenses for her living expenses.

28. Tenn. Code Ann. § 36-5-121(l)(9): *The standard of living of the parties established during the marriage*: The parties enjoyed a good standard of living. Their house is valued at approximately $495,000. Their children attended private schools. The parties purchased new vehicles. Wife shopped at Macy's and Talbots, regularly received manicures, and visited Gould's Hair Salon on a regular basis. The parties took vacations, both with the children and Wife with her friends.

29. Tenn. Code Ann. § 36-5-121(l)(10): *The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party*: Until 2006, Wife was the primary caretaker. In the later years of the marriage, Husband cared for the children. When Husband was offered a management position at FedEx, after one year of Wife working as an attorney at Lexmark, Wife gave her up Job with Lexmark. Husband's career with FedEx has thereafter flourished. Wife's legal career has not been prosperous.

30. Tenn. Code Ann. § 36-5-121(i)(11): *The relative fault of the parties*: The Court does not find one party more at fault in the deterioration and demise of the marriage.

31. Wife is heavily economically disadvantaged relative to Husband and she is incapable of rehabilitation; therefore, rehabilitative alimony is not appropriate in this case.

32. Based on her past earnings and current mental health issues, Wife cannot achieve an earning capacity that would reasonably compare to the standard of living to which she was accustomed during the marriage.

Based on the foregoing findings, the trial court awarded Wife both alimony *in futuro* and alimony *in solido*.

As an initial matter, Husband asserts that the trial court miscalculated his income for purposes of arriving at the amount of alimony. On June 6, 2017, the trial court entered a "Consent Order on Stock Sale," under which the parties agreed that "Husband shall sell the vested stock options he holds in FedEx," with each party receiving one-half of the sales proceeds and each party shouldering one-half of the tax consequences of the sale. Because Husband's 2017 stock options were divided as a marital asset, Husband contends that the amount of these stock options was incorrectly included in Wife's expert, Rosemary Frank's, calculation of his income for alimony purposes. Because the trial court relied on Ms. Frank's allegedly erroneous calculation, in which she included "bonuses and stock options" in arriving at $276,000 as Husband's median salary for 2016-2017, Husband maintains that the divided funds from the exercise of the stock options should not have been included in the calculation of his income. Omitting those stock option funds, Husband states that his "actual salary in 2016 was $173,457 and his salary in 2017 was $182,652" and opines that his alimony obligation should have been based on these smaller amounts. Under the particular facts of this case, we disagree. Although assets divided as marital property are not usually considered "income" for purposes of alimony, in this case, it was Husband's practice to cash his yearly stock options to supplement his income. As found by the trial court:

> 130. During the course of the marriage, Husband liquidated and spent the proceeds from all FedEx stock options and bonuses on the marital household without Wife's knowledge. (Wife's 3/19/2018 direct examination testimony).
> 131. The Court does not find Wife credible on the position that she did not know Husband used stock options and bonuses to pay household bills.

(Citation to record in original).

The trial court acknowledged that Husband used a portion of the stock option funds to pay for the parties' daughter's college tuition and expenses. In its findings, the trial court noted Wife's objection to this practice:

> 137. On February 10, 2017, Wife's counsel sent a letter to Husband's counsel enclosing Wife's filed Objection. In the letter, Wife's counsel advised Husband's counsel that Wife did not agree with Husband's utilization of marital assets to pay their adult children's education and living expenses. Wife's counsel requested that Husband provide an accounting of funds he spent on the parties' adult children.
> 138. As of February 2017, the only accounting Husband provided was on April 25, 2016 to Wife's previous counsel. However, this accounting only provided information regarding Husband's November 5, 2015 exercise of stock options. Husband took the position that "**It was the parties [sic] practice to utilize the sale of stock and/or options to fund the family**

- 23 -

**expenses**."

139. On February 13, 2017, Husband's counsel sent a letter to Wife's counsel **stating that Husband considered his stock options to be compensation**. Husband took the position that the mutual injunction allowed him to **utilize those funds to pay expenditures from current income to maintain the marital standard of living**. Husband's counsel stated "It has always been the parties' [sic] intent and practice to pay the expense [sic] for their children, including college."

(Emphases added; some citations to record omitted). On July 18, 2017, Wife filed a petition for injunctive relief to enjoin Husband from exercising stock options without Wife's consent and for an accounting of Husband's spending on the parties' children. The trial court granted Wife's motion and ordered Husband to make an accounting of the spending on the children. In his accounting, Husband indicated that he "spent a total of at least $172,034 in marital funds on the adult children during this divorce." However, the trial court ultimately held that

Wife's claim for dissipation as it relates to funds spent by Husband on the children is denied. The expenses paid by Husband were not wasteful and were geared towards family expenses and the education of the children. Wife's objection to payment of college educational expenses is inconsistent with her priority on the children's education.

The trial court's findings are supported by the evidence. Throughout the marriage, Husband cashed his stock options to supplement his income. As such, these cash infusions were part of his marital income. Although the parties agreed to divide the stock option payments from 2016 and 2017 as a marital asset, the historical use of stock option funds as income supports the trial court's inclusion of the stock options as income for purposes of calculating alimony. Under the particular facts presented here and specifically the parties' practice of supplementing Husband's income by exercising stock options, it was not error for the trial court to consider stock options in calculating Husband's income for purposes of alimony. We now turn to address each alimony award.

### 1. Alimony *in futuro*

The trial court awarded Wife alimony *in futuro* "in the amount of $5,500.00 per month for forty-eight (48) months . . . . Thereafter, the alimony shall be reduced to $3,500.00 per month until Husband turns seventy (70) years of age."[1] Tennessee Code

---

[1] The trial court further held that:

In the event Wife is approved for social security disability benefits, alimony shall be

Annotated section 36-5-121(f)(1) provides for an award of alimony *in futuro*

> when the court finds that there is relative economic disadvantage and that rehabilitation is not feasible, meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

Tenn. Code Ann. § 36-5-121(f)(1); ***Gonsewski***, 350 S.W.3d at 107-08. As discussed *supra*, the evidence demonstrated that a significant income disparity existed between the parties. Although Wife is educated and skilled, her work experience during the most recent years has been limited due to her ongoing mental health issues. Furthermore, Wife's current income is derived solely from the assets she was awarded in the divorce and the $1,000 per month of stipulated income.

> In her appellate brief, Wife argues that:

> > Although the Court should affirm the award of $5,500 per month in alimony in futuro, the Court should reverse the trial court's limitation of that payment to 48 months. Instead, the Court should modify the judgment by holding, as Wife requested at trial: that Wife shall be entitled to receive from Husband $5,500 per month in alimony in futuro, to continue until the Husband retires or reaches age 70; and that, once Husband retires or reaches age 70, Wife's alimony in futuro would reduce to $2,500 per month, to be paid for the remainder of Wife's lifetime.
> > For the same reasons, the Court should also alternatively increase Wife's alimony in futuro to $7,500 per month until Husband reaches age 70 or retires.

Husband, however, argues that the trial court erred in awarding Wife $5,500 in alimony *in futuro*. Husband's argument is based on his assertion that the evidence does not support a finding that Wife is unable to work. In its findings of fact, the trial court stated, in relevant part:

---

reduced to $3,500/month. Should Wife receive a lump sum payment from the Social Security Disability Administration representing past months, Husband shall be reimbursed proportionately for each month of alimony that has been awarded to Wife from any lump sum payment.

34. Wife has taken the position that she cannot work due to depression (Testimony of Wife).

35. None of the doctors or therapists seen by Wife testified that she could not work (Testimony of Dr. Ciocca).

36. John Ciocca, PhD, testified that in his opinion. Wife could not work "full-time" due to depression (Testimony of Dr. Ciocca).

37. Dr. Hardison stated that Wife could work in a law firm with reduced hours (Exhibit 1 - Heather Hardison records).

(Citations to record in original).  The trial court further noted that Wife "has not been completely compliant with her treatment recommendations."  However, the trial court acknowledged the fact that Wife "was working as an attorney, both for the National Network of Estate Planners and operating her own law firm" at the time she filed her complaint for divorce.  Although the trial court noted that Wife's employment was terminated in June of 2015, it found that Wife has "done nothing to replace said lost income" since January 2018.  So, contrary to Husband's contention, the trial court did not find that Wife was unable to work.  Relying on Dr. Ciocca's testimony, which the trial court specifically found to be credible, *i.e.*, "Dr. Ciocca was a credible expert witness," the trial court found that "Wife's symptoms combine to produce a situation where she is unable to do ongoing, continuous, meaningful work."  However, the trial court opined that "[t]his does not mean Wife will always be this way."  Like Dr. Ciocca, the trial court found that "Wife's prognosis is a question mark," but Wife is not "faking her symptoms or malingering."  Dr. Ciocca's testimony concerning Wife's current inability to maintain "ongoing, continuous, meaningful work" was uncontroverted, and the trial court held that "Wife's capacity to engage in even limited work is limited **at the present time**" (emphasis added), and that "Wife cannot achieve an earning capacity that would reasonably compare to the standard of living to which she was accustomed during the marriage."  As such, there is sufficient evidence to support the trial court's finding that Wife has need of alimony *in futuro*. Furthermore, given Husband's superior earning capacity, he has the ability to pay alimony *in futuro*.

Turning to Wife's contention that the amount of the alimony *in futuro* award should have been more or that the award should have been extended for a longer duration, we disagree.  Again, Wife is not completely disabled.  The trial court held that "[o]ngoing treatment for Wife is required before she can do sustained, high volumes of work as an engineer or lawyer" and noted that "Wife is in a constant state of grieving." However, the trial court ultimately held that, "Wife has good treatment providers," and "[i]f Wife's treatment plan could include a meaningful effort to restore her relationship with her children, her prognosis would go up several notches."  The inference is that Wife will have to do a lot of work to improve her mental state, but that goal is achievable.  The limitation of $5,500 in alimony *in futuro* to forty-eight months will motivate Wife to do this work.

In addition, the trial court also properly considered Wife's age and social security benefit eligibility in setting both the amount and duration of the alimony *in futuro*. The trial court found that

> [i]f Wife draws social security at age 70, her payment would be approximately $2,710/month. At her full retirement age, which is 66 years, 8 months, her payment would be about $2,173/month. At age 62, early retirement age, her benefit would be about $1,523/month. If approved for disability benefits, her payment would be about $2,224/month.

Wife was 60 years old at the time of the divorce. Wife will receive alimony *in futuro* of $5,500 per month for four years, at which time she will be eligible for social security benefits. Then, the alimony *in futuro* will continue at the reduced rate of $3,500 until Husband reaches the age of 70, i.e., an additional 11 years. These amounts, coupled with Wife's estimated social security benefits, should provide her with sufficient income going forward. As such, we conclude that the trial court did not err in either the amount or the duration of alimony *in futuro* award.

## 2. Alimony *in solido*

The trial court also awarded Wife a portion her attorney's fees as alimony *in solido*, to-wit:

> 34. Wife's total attorney fees and litigation expenses as of trial were $289,959.00. Wife shall be awarded alimony in solido for her attorney's fees and suit expenses.
> 35. Husband shall pay to Wife alimony in solido in the amount of $65,000.00 at the rate of $1,000.00 per month until paid in full. Interest at the statutory rate of 6.5% shall accrue and Husband may pre-pay this amount at any time.

On appeal, Husband argues that, in view of the division of marital property and the award of alimony *in futuro*, Wife has the means to pay her own attorney's fees; as such, Husband asks this Court to reverse the trial court's award of alimony *in solido*. Wife, however, maintains that the trial court erred in awarding her only $65,000 of the $289,959 in attorney's fees and costs she accrued during the divorce. She asks this Court to modify the trial court's order to award her $289,959 in alimony *in solido*.

An award of attorney fees in divorce cases is considered spousal support, generally characterized as alimony *in solido*. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002). An award of such fees is subject to the same factors that must be considered in the award of any other type of alimony. *Gonsewski*, 350 S.W.3d at 113; *Yount*, 91 S.W.3d at 783. Therefore, the statutory factors listed in Tennessee Code Annotated section 36-5-121(i) are to be considered in a determination of whether to award attorney fees.

*Langschmidt*, 81 S.W.3d at 751.  In his appellate brief, Husband asserts that the trial court failed to consider the foregoing statutory factors in awarding Wife alimony *in solido*.  We disagree.  As set out above, the trial court made specific findings concerning each of the relevant statutory factors, then used those findings to arrive at the amount of alimony *in futuro* and alimony *in solido*.  The trial court did not need to reiterate its findings under each category of spousal support.

Awards of attorney fees are within the sound discretion of the trial court.  ***Kincaid v. Kincaid***, 912 S.W.2d 140, 144 (Tenn. Ct. App. 1995). However, this Court has explained that awards of attorney's fees as alimony *in solido*

> "are appropriate . . . only when the spouse seeking them lacks sufficient funds to pay his or her own legal expenses," ***Brown v. Brown***, 913 S.W.2d 163, 170 (Tenn. Ct. App. 1994) (citing ***Houghland v. Houghland***, 844 S.W.2d 619, 623 (Tenn. Ct. App. 1992), and ***Ingram v. Ingram***, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986)), or would be required to "deplete his or her resources in order to pay these expenses." *Id*. (citing ***Harwell v. Harwell***, 612 S.W.2d 182, 185 (Tenn. Ct. App. 1980)). Where one party has been awarded additional funds for maintenance and support and such funds are intended to provide the party with a source of future income, the party need not be required to pay legal expenses by using assets that will provide for future income. ***Batson v. Batson***, 769 S.W.2d 849, 862 (Tenn. Ct. App. 1988).

***Koja v. Koja***, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000).  As discussed above, Wife's mental health issues create a barrier to her ability to earn consistent income in the future.  On the other hand, Husband's earning potential is proven and stable.  In short, Wife is economically disadvantaged compared to Husband.  While Wife was awarded alimony *in futuro*, such award was meant to provide Wife with "a source of future income."  Although Wife received a larger share of marital property than Husband, she was also charged with a larger amount of marital debt than Husband.  Under the holding in ***Koja***, Wife should "not be required to pay legal expenses by using assets that will provide for future income." *Id.* at 98.  However, as to Wife's argument that the trial court erred in not awarding her the full amount of her attorney's fees as alimony *in solido*, we are unpersuaded.  In awarding only $65,000 of the $289,959 in attorney's fees and costs Wife accrued during the divorce, the trial court made the following statements from the bench during the hearing on the parties' cross-motions to alter or amend:

> So there was a request for an award of attorney fees, and because of the nature of some of the fees and the issues that followed in accumulating those fees, I awarded only 65,000 dollars in fees.
> I thought that that was fair under the circumstances of the facts that were presented to me.  I did not award the entire fees that were accumulated

by Ms. Murdock.

***

Well, one of the things that I found . . . is that many of the activities [for which Wife's attorney billed] in either pursuing a paramour or trying to find income that was being squirreled away by Mr. Murdock, it was unfounded.

Obviously, the trial court found some of Wife's attorney's fees to be unnecessary and/or unreasonable. This Court has explained that

> "'the reasonableness of the fee must depend upon the particular circumstances of the individual case.'" *Wright ex rel. Wright*, 337 S.W.3d [176, 181 (Tenn. 2011)] (quoting *White v. McBride*, 37 S.W.2d 796, 800 (Tenn. 1996). The trial court's determination of reasonable attorney's fees is "'a subjective judgment based on evidence and the experience of the trier of facts[.]'" [*Wright*, 337 S.W.3d at 176] (quoting *United Med. Corp of Tenn., Inc. v. Hohenwald Bank & Trust Co.*, 703 S.W.2d 133, 137 (Tenn. 1986)[)]; *see also Hosier* [*v. Crye-Leike Commercial, Inc.*, No. M2000-01182-COA-R3-CV,] 2001 WL 799740, at *6 [(Tenn. Ct. App. July 17, 2001)] ("Trial courts are perfectly capable of applying these factors and deciding whether a requested fee is reasonable based on their knowledge of the case and their perception of the value of the services performed.").

*In re Estate of Storey*, No. W2017-00689-COA-R3-CV, 2018 WL 1151944, at *9 (Tenn. Ct. App. March 5, 2018), *perm. app. denied* (Tenn. July 19, 2018). Having reviewed the record on Wife's attorney's fees, we cannot conclude that the trial court abused its discretion in finding that some of the charges were unwarranted under the facts of this case. Aside from the trial court's finding that some of Wife's fees were unwarranted, the trial court's award of $65,000 as alimony *in solido* is equitable in view of the division of the marital estate and the award of alimony *in futuro.* Although Wife should not be required to deplete all of her resources in paying her attorney's fees, Husband should not be required to pay the full measure of the fees on her behalf. Wife is not without resources. In view of the award of marital property and the ongoing spousal support, Wife will be able to service the debt on her attorney's fees. As such, we affirm the trial court's award of $65,000 in alimony *in solido*.

### 3. Fault

In arriving at an award of alimony, Tennessee Code Annotated section 36-5-121(i)(11) allows the trial court to consider [t]he relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so." Wife contends that the trial court

- 29 -

erred in failing to find Husband at fault "for a pattern of abuse and parental alienation of children against Wife." Wife maintains that such parental alienation is a primary factor in the mental health issues she suffers and her inability to maintain gainful employment. As set out above, the trial court considered this statutory factor but ultimately did "not find one party more at fault in the deterioration and demise of the marriage." Wife argues that this Court "should amend the [the trial court's] judgment by finding that the preponderance of the evidence reveals a pattern of abuse and parental alienation of children against Wife, which has contributed to her inability to work." In the first instance, there is no indication that such finding would have led the trial court to alter its award of alimony in this case. In fact, contrary to Wife's argument, the trial court did acknowledge the fact that Wife is grieving the loss of relationship with her children. However, the trial court noted that "Wife provided no [] proof of the verbal abuse or [] the physical abuse both of which Husband denied." Concerning the allegations of parental alienation, we note that the parties' children were emancipated during the course of these proceedings. Nonetheless, the record shows that for six months, beginning in August 2013, the parties participated in counseling with the children in the hope of improving Wife's relationship with them. Despite the therapy, the trial court noted that "no therapeutic evidence was offered to substantiate that there was parental alienation and that Husband was the primary cause of the alienation." As such, the trial court held that "Wife's claim of alienation on the part of Husband lacks substance and corroboration." We agree. Again, the parties' children are adults and, as such, may choose for themselves whether to have a relationship with their mother. Certainly, the loss of relationship with her children has had a negative impact on Wife's mental health, and it is this Court's hope that these relationships will be restored going forward. However, as the trial court found, there is simply insufficient evidence to support a finding that Husband engaged in a pattern of parental alienation or abuse.

## V. Conclusion

For the foregoing reasons, we affirm the trial court's order. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed one-half to Appellant, Joel Montgomery Murdock, and one-half to Appellee, Deborah Elaine Murdock, for all of which execution may issue if necessary.

_____s/ Kenny Armstrong_____
KENNY ARMSTRONG, JUDGE
